IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TRAVIS GLASS

    Plaintiff,

v.                                                                                                No. 1:21-cv-00543-JCH-JMR

INTEGRITY INSPECTION SERVICES, LLC,

    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Integrity Inspection Services, LLC's *Motion to Dismiss* (ECF No. 60). Integrity argues that Plaintiff Travis Glass's Second Amended Complaint fails to state a claim upon which relief may be granted for tortious interference with an employment contract. Integrity is correct: Mr. Glass's Second Amended Complaint does not plausibly claim that Integrity is vicariously liable for the knowledge or actions of a third party; that Integrity knew of a contract between Mr. Glass and his employer (or even that one existed); or that Integrity played an active and substantial role in Mr. Glass's termination. Thus, the Court will grant Integrity's motion.

**I.    STANDARD**

The legal standard affects which facts the Court will consider. The federal pleading standard governs this motion. *See Adams v. C3 Pipeline Constr., Inc.*, 30 F.4th 943, 972 n.13 (10th Cir. 2021). Under this standard, a court may dismiss an action if a complaint fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). All facts and plausible inferences contained in the complaint must be construed in the light most favorable to the nonmoving party. *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023).

1

"[L]egal conclusions can provide the framework of a complaint, [but] they must be supported with factual allegations." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1241 (10th Cir. 2013) (second alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept as true "all well-pleaded *facts*, as distinguished from conclusory allegations." *Adams*, 30 F.4th 943, 972 (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017)). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Matney*, 80 F.4th at 1144 ("A conclusory allegation is one in which an inference is asserted without 'stating underlying facts' or including 'any factual enhancement.'" (quoting *Brooks v. Mentor Worldwide, LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021))). After disregarding conclusory allegations, a court will "look to the remaining factual allegations to see whether Plaintiffs have stated a plausible claim." *Matney*, 80 F.4th at 1145 (quoting *Brooks*, 985 F.3d at 1281). In sum, dismissal under Rule 12(b)(6) is appropriate if the pleaded "factual allegations [are not] enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

On a Rule 12(b)(6) motion to dismiss, facts must come from the complaint alone. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014). If "matters outside the pleadings are presented to and not excluded by the court," then a court must convert the motion into one for summary judgement. Fed. R. Civ. P. 12(d). Here, the Court did not consider any materials outside the pleadings, despite Integrity's citation to other materials. *See, e.g.*, Def.'s Ex. A (ECF No. 60-1) (transcript of Mr. Glass's deposition); Reply 5 (ECF No. 69) (quoting from Mr. Glass's deposition). Thus, Integrity's motion remains under Rule 12(b)(6).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The facts below come from the Mr. Glass's Second Amended Complaint. *See* Second Am. Compl. (ECF No. 40). TRC Construction employed Mr. Glass on a construction job. *See id.* ¶ 7. TRC was a subcontractor for XTO Energy. *See id.*[1] Mr. Glass alleges that Tommie Criddle was an employee or agent for Integrity or XTO. *See id.* ¶ 20.

Mr. Glass suffers from diabetes. *See id.* ¶ 8. He has a service dog, a small chihuahua, to alert him of impending medical emergencies. *See id.* He brought his service dog to work. *See id.* ¶¶ 8, 10.

Mr. Glass recounts that on June 26, 2019, he and Mr. Criddle argued about the service dog. *See id.* ¶¶ 9, 11. According to Mr. Glass, Mr. Criddle insisted that Mr. Glass could not bring his service dog to work; refused to look at the medical documentation for his service dog; and replied, "there's not a fucking thing you can do about it," when Mr. Glass said that he would seek legal advice. *See id.* ¶¶ 11-13. After this interaction with Mr. Criddle, Mr. Glass approached his TRC supervisor. *See id.* ¶ 14. The TRC supervisor allegedly told Mr. Glass to keep working because Mr. Criddle had not "thrown him off the job." *Id.*

The next day, Mr. Glass's TRC supervisor told Mr. Glass, "you're not going to believe this, but XTO is making us take you off the job." *See id.* ¶ 15. The reason given for Mr. Glass's termination was a safety violation that occurred weeks prior: Mr. Glass "accidentally dropped some pipe" while unloading a truck. *See id.* ¶ 16.

---

[1] The Second Amended Complaint does not explain Integrity's relationship with XTO or TRC. From a source outside of the Second Amended Complaint, the Court learned that Integrity inspected pipelines for XTO. *See* XTO's Ex. C, ¶ 4 (ECF No. 27-3). The Court mentions this fact only to offer context for the reader. This fact did not influence the Court's decision.

### B. Procedural History

Mr. Glass first sued XTO and Mr. Criddle in state court. His original complaint had two counts: tortious interference with contract and retaliatory discharge. *See* Compl. ¶¶ 18-32 (ECF No. 1-1). XTO removed the action to this Court pursuant to 28 USC §§ 1332, 1441, and 1446. *See* Notice of Removal, ¶ 9 (ECF No. 1).

Following receipt of a sworn declaration from XTO that Mr. Criddle was never an XTO employee but an Integrity employee, Mr. Glass added Integrity as a defendant and filed his Second Amended Complaint. *See* Def.'s Ex. C, ¶¶ 4-5 (ECF No. 27-3); ECF No. 40, ¶ 6.[2] On June 15, 2023, the Court dismissed Mr. Glass's claims against Mr. Criddle without prejudice for Mr. Glass's failure to timely serve Mr. Criddle with his Second Amended Complaint. *See* Mem. Op. & Order (ECF No. 77). The remaining parties—XTO, Integrity, and Mr. Glass—then filed a joint stipulation to dismiss the claims against XTO with prejudice; the Court granted the stipulation and dismissed XTO on June 23, 2023. *See* Second Joint Stipulation (ECF No. 80); Order (ECF No. 81).

Integrity moved to dismiss on April 3, 2023. *See* ECF No. 60. In his response, Mr. Glass waived his retaliatory discharge claim. *See* Resp. 2 (ECF No. 65); Order (ECF No. 79) (giving Mr. Glass option—that he did not take—to rescind waiver). Thus, the only remaining claim is against Integrity for tortious interference with contract. *See* ECF No. 40, ¶¶ 18b-27.

### III. DISCUSSION

Because the Court has jurisdiction under 28 U.S.C. § 1332 and the alleged wrongs took place in New Mexico, the substantive law of New Mexico applies. *See Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1164 (10th Cir. 2017).

---

[2] The Second Amended Complaint makes no mention of XTO's sworn declaration that Integrity employed Mr. Criddle. Thus, the Court will not consider the declaration as supporting the allegations in the Second Amended Complaint.

4

Mr. Glass alleges that Integrity—through Mr. Criddle—interfered with an employment contract between Mr. Glass and TRC. *See* ECF No. 40, ¶ 20. In his tortious-interference claim, Mr. Glass has the burden to show that Integrity, "without justification or privilege to do so, induce[d] a third person not to perform a contract with another." *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 16, 137 P.3d 577 (quoting *Wolf v. Perry*, 1959-NMSC-044, ¶ 18, 339 P.2d 679).

New Mexico courts divide cases into two categories: (1) tortious interference with an existing contract, and (2) tortious interference with prospective contractual relations. *See Zarr v. Washington Tru Sols., LLC*, 2009-NMCA-050, ¶ 6, 208 P.3d 919; *see also Fikes v. Furst*, 2003-NMSC-033, ¶¶ 21-22, 81 P.3d 545. The category for prospective contracts includes at-will contracts. *See Fikes*, 2003-NMSC-033, ¶ 21.

The Court will treat Mr. Glass's claim solely as one for tortious interference with an existing contract for three reasons. First, Mr. Glass's Second Amended Complaint states that he and TRC had an "employment contract." *See* ECF No. 40, ¶ 19b; *see also* ECF No. 65, at 2 (referencing Mr. Glass's "employment contract"). Second, Mr. Glass nowhere mentions at-will employment. And third, the Second Amended Complaint includes a claim for "tortious interference with contract"—not tortious interference with a prospective contractual relationship. ECF No. 40, ¶¶ 18b-27.

The elements for tortious interference with an existing contract apply to both express and implied contracts. *See Fierro v. Mesa Verde Enters.*, 244 F. Supp. 3d 1153, 1166-68 (D.N.M. 2007). This tort has five elements:

(1) The defendant knew about the contract between the plaintiff and the other party;

(2) Performance of the contract was refused;

(3) The defendant played an active and substantial part in causing the plaintiff to lose the benefits of his contract;

(4)     Damages flowed from the breached contract; and

(5)     The defendant induced the breach without justification or privilege to do so.

*Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 17 P.3d 440 (quoting *Wolf*, 1959-NMSC-044, ¶¶ 18-21).

Mr. Glass fails to plausibly show that Integrity knew of a contract between Mr. Glass and TRC (or even that Mr. Glass had a contract with TRC); and that Integrity played an active and substantial part in Mr. Glass's termination. Before discussing these elements, however, the Court will discuss how Mr. Glass also fails to plausibly show a prerequisite: that Integrity may be vicariously liable for Mr. Criddle's knowledge or actions.

### A.     Vicarious Liability

A theory of vicarious liability is necessary to impute Mr. Criddle's knowledge or actions to Integrity. *See, e.g.*, *Array Techs.*, 305 F. Supp. 3d at 1274. ("It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority."). Mr. Glass suggests that Integrity should be vicariously liable for Mr. Criddle's knowledge or actions through an employer-employee relationship or a principal-agent relationship. *See* ECF No. 40, ¶ 20 ("Defendant XTO and Defendant Integrity either employed Criddle, or he acted as [its] agent when he forced TRC to terminate [Mr. Glass]."); *see also Tercero v. Roman Cath. Diocese of Norwich*, 2002-NMSC-018, ¶ 21, 48 P.3d 50 ("Generally, the employer/employee relationship is encompassed within the broader principal/agent relationship . . . .").

#### 1.     Employer-Employee Relationship

"Under basic respondeat superior principles, an employer is liable for an employee's torts committed within the scope of his or her employment." *Spurlock v. Townes*, 2016-NMSC-014,

¶ 13, 368 P.3d 1213 (quoting *Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 29, 91 P.3d 58).

The New Mexico Supreme Court has defined an employer-employee relationship:

> The primary test to determine whether an employer-employee relationship exists is whether the employer has the right to control the details of the work of the employee. The secondary tests of the employer-employee relationship include: 1) direct evidence of the employer's right to control the manner and means of employee's performance; 2) the method of payment of compensation; 3) whether the employer furnishes equipment; and 4) the employer's right to end the relationship.

*Tercero*, 2002-NMSC-018, ¶ 22 (citing *Savinsky v. Bromley Grp., Ltd.*, 1987-NMCA-078, ¶ 4, 740 P.2d 1159).

A statement that someone is an "employee"—without any factual basis—is a legal conclusion that need not be accepted as true on a motion to dismiss. *See, e.g.*, *K.A. v. Boy Scouts of Am.*, No. 17-cv-00021, 2017 WL 3173002, at *6 (D.N.M. May 23, 2017) ("Plaintiff jumps to the legal conclusion in his Complaint that [alleged tortfeasor] was [defendant-corporation's] employee, but the Court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" (citation omitted) (quoting *Twombly*, 550 U.S. at 555)); *see also Ferreira v. Monadnock Paper Mills, Inc.*, No. 13-cv-00425, 2014 WL 768840, at *2 (D.N.H. Feb. 25, 2014); *Weise v. Eisai, Inc.*, No. 11-cv-00713, 2012 WL 84701, at *3 (D. Colo. Jan. 11, 2012). Indeed, when complaints sufficiently plead employer-employee relationships, they allege facts that accompany the label of "employee." *Cf., e.g.*, *Guereca v. Cordero*, 487 F. Supp. 3d 1138, 1150 (D.N.M. 2020) ("Plaintiff has alleged that she and other cleaning techs were paid an hourly wage by Defendants, that cleaning techs work over forty hours per week, that their work consists of cleaning and performing other manual labor in the properties of the customers of Defendants' business (a cleaning service), and that Defendants determine their rates of pay and have the authority to hire and fire them."); *Randazzo v. CH2M Hill, Inc.*, No. 13-cv-03276, 2014 WL 4697131, at *13 (D. Colo. Sept. 22, 2014) (holding plaintiff satisfied pleading standard by alleging

7

"she was Lead Paralegal, Litigation Paralegal, and Litigation Support Manager for the Company; she was responsible for highly sensitive and high risk litigation matters and high-profile criminal investigations and lawsuits; she was highly occupied with [an] investigation; that she had a stellar career, which had progressed immensely, and she received frequent pay raises and promotions" (internal citations and alterations omitted)).

Mr. Glass alleges that Integrity and XTO "employed [Mr.] Criddle." *See* ECF No. 40, ¶ 20. But this is a legal conclusion that the Court may disregard. *See K.A.*, 2017 WL 3173002, at *6. And nothing else links Integrity to Mr. Criddle. The Second Amended Complaint contains no allegations that Integrity had the right to control Mr. Criddle's work or performance, that Integrity paid Mr. Criddle, that Integrity gave Mr. Criddle any equipment, or that Integrity could terminate Mr. Criddle. *Cf. Tercero*, 2002-NMSC-018, ¶ 22. At bottom, Mr. Glass's legal conclusion that Integrity "employed [Mr.] Criddle" does not "nudge[] [his] claim[] across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

### 2.  Principal-Agent Relationship

"An agent is one authorized by another to act on his behalf and under his control." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 26, 42 P.3d 1221 (quoting *Hansler v. Bass*, 1987-NMCA-106, ¶ 28, 743 P.2d 1031); *see also Carlsberg Mgmt. Co. v. State*, 1993-NMCA-121, ¶ 18, 861 P.2d 288 ("[T]he retention of control by [the principal] and the delegation of specified duties indicates an agency relationship."). A principal is responsible for an agent's torts when the agent acts under either actual or apparent authority. *Romero v. Mervyn's*, 1989-NMSC-081, ¶ 12, 784 P.2d 992. "[A]ctual authority is determined in light of the principal's 'manifestations of consent' to the agent[;] apparent authority arises from the principal's manifestations to third parties." *Id.* (citation omitted).

As with an employer-employee relationship, "[i]t is insufficient to merely plead the legal conclusions of agency." *See, e.g.*, *Williams v. Ford Motor Co.*, 990 F. Supp. 551, 554 (N.D. Ill. 1997); *see also J.L. v. Best W. Int'l*, 521 F. Supp. 3d 1048, 1065 (D. Colo. 2021); *K.A.*, 2017 WL 3173002, at *6. Thus, when complaints survive motions to dismiss in this context, they plead facts that show the establishment of an agency relationship. *Cf., e.g.*, *Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1161-62 (D. Kan. 2017) ("[T]he Complaint alleges that [principal] sent [agent] to plaintiff's auction for the purpose of purchasing livestock for and on behalf of [principal], and that [agent] in fact attended the auction and purchased cattle on [principal's] behalf." (internal quotations omitted)).

Mr. Glass alleges that Mr. Criddle "acted as [Integrity's or XTO's] agent." *Id.* ¶ 20. Once again, this is a legal conclusion that the Court may disregard. *See K.A.*, 2017 WL 3173002, at *6. The Second Amended Complaint lacks any indicia of a manifestation from Integrity to Mr. Criddle, Mr. Glass, or anyone else that Mr. Criddle was acting on Integrity's behalf and subject to Integrity's control. *See Romero*, 1989-NMSC-081, ¶ 12.

Mr. Glass also alleges, "[Mr. Glass] was told by defendant Criddle, in his employment or work for XTO or in his employment or work for Integrity, that [Mr. Glass] could not have his service dog at work." ECF No. 40, ¶ 9. But the clause "in [Mr. Criddle's] employment or work for XTO or in his employment or work for Integrity" is another conclusory allegation that the Court may disregard. Mr. Glass does not explain why he thought that Mr. Criddle worked for Integrity.

In fact, if the Second Amended Complaint suggests that *anyone* is Mr. Criddle's principal, it would be XTO. When Mr. Glass's TRC supervisor fired Mr. Glass, the supervisor said, "you're not going to believe this, but *XTO* is making us take you off the job." *Id.* ¶ 15 (emphasis added). At most, this implies that the supervisor believed that Mr. Criddle worked for or represented XTO.

And nothing in the Second Amended Complaint alleges or explains that the TRC supervisor was mistaken when he blamed XTO.[3]

All told, Mr. Glass fails to plausibly show that Integrity and Mr. Criddle shared a principal-agent relationship. *See Iqbal*, 556 U.S. at 678-79. Thus, Mr. Glass has failed to show that Integrity can be vicariously liable for Mr. Criddle's knowledge or actions.

### B. Existence of a Contract Between Mr. Glass and TRC and Integrity's Knowledge of That Contract

To make out his claim for tortious interference with contract, Mr. Glass would need to prove that Integrity knew of a contract between Mr. Glass and TRC. *See Ettenson*, 2001-NMCA-003, ¶ 14. This element, however, presupposes the existence of a contract. *See id.* ¶ 25 (reversing plaintiff's verdict because jury instruction for tortious interference with contract did not "require the jury to determine whether a contract existed between [the third party] and [the plaintiff]"). To satisfy this first element, therefore, Mr. Glass must prove both (1) the existence of a contract and (2) Integrity's knowledge of that contract. *See id.*

#### 1. Existence of a Contract

In New Mexico, "the general rule . . . is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 4, 857 P.2d 776. Both express and implied employment contracts are an exception to New Mexico's presumption of at-will employment. *See Hudson v. Vill. Inn Pancake House of Albuquerque, Inc.*, 2001-NMCA-104, ¶ 3, 35 P.3d 313 (citing *Hartbarger*, 1993-NMSC-029, ¶ 4).

---

[3] Mr. Glass had the chance to allege or explain such a mistake by the TRC Supervisor: he amended his complaint *after* receiving a sworn declaration from XTO that Mr. Criddle was never an XTO employee but an Integrity employee. *See* Def.'s Ex. C, ¶¶ 4-5 (ECF No. 27-3); ECF No. 40, ¶ 6.

        *a.*      *Express Contract*

Mere use of the word "contract" is not enough to plausibly claim a contract's existence. *See, e.g.*, *Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1257 (W.D. Okla. 2012) (holding complaint fell short because it did not "identify or describe" contracts allegedly breached); *Bushnell Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1288 (D. Kan. 1997) ("[P]laintiff has alleged that it had 'contractual relations' with its customers and vendors. It has not, however, alleged that any particular contract was breached as a result of conduct by defendant."). Rather, a complaint should include at least some details about the contract. *Cf., e.g.*, *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 538-39 (5th Cir. 2023) (holding that plaintiff sufficiently alleged a contractual relationship because the complaint "allege[d] the existence of sustained relationships, contractual and non-contractual, with a constituency of healthcare providers"); *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 842, 845 (4th Cir. 2004) (holding allegation of a contractual relationship was "supported by specific factual assertions," such as allegations that plaintiff had sent "several written documents to [the defendant] memorializing the contract"); *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1212 (D. Kan. 2004) (explaining that even though plaintiffs did not "specifically allege" an employment contract, complaint discussed terms from contract that plausibly showed contract's existence).

The Second Amended Complaint makes only one explicit reference to a contract: Paragraph 19b alleges that Integrity "had knowledge of the employment contract between TRC and [Mr. Glass]." *See* ECF No. 40, ¶ 19b. This is a conclusory statement that the Court can disregard. *See Iqbal*, 556 U.S. at 686.

To be sure, the Second Amended Complaint includes some other details about Mr. Glass's work with TRC. For example, the Second Amended Complaint states that TRC employed Mr.

Glass on June 27, 2019, that Mr. Glass had a TRC supervisor, and that Mr. Glass unloaded pipe as part of the job. *See* ECF No. 40, ¶¶ 7, 14, 16. But these details are silent on whether Mr. Glass was a contractual or at-will employee. Said otherwise, they are not enough for the Court to infer the existence of a contract between Mr. Glass and TRC.

### b. *Implied Contract*

"Implied contracts" arise when an "employer promise[s] that the employee [will] be discharged only for good cause." *Hartbarger*, 1993-NMSC-029, ¶ 13. The party asserting the existence of an implied contract has the burden to allege "facts show[ing] that the employer either has made a direct or indirect reference that termination would be only for just cause or has established procedures for termination." *See id.* ¶ 5; *see, e.g.*, *Forrester v. Parker*, 1980-NMSC-014, ¶ 4, 606 P.2d 19) (holding corporation's personnel policy guide created implied contract with employee). An employer's promise to an employee must be "sufficiently explicit" to create an implied contract. *See, e.g.*, *Hartbarger*, 1993-NMSC-029, ¶ 5.

Nothing in the Second Amended Complaint shows a limitation on TRC's ability to fire Mr. Glass. To the contrary, the Second Amended Complaint suggests that TRC summarily fired Mr. Glass. *See id.* ¶ 15. And Mr. Glass neither named TRC as a defendant nor alleged that TRC breached any of its own policies by firing Mr. Glass. Thus, the Second Amended Complaint does not plausibly show the existence of an implied contract.

### 2. Knowledge of a Contract

Because the Second Amended Complaint does not plausibly claim an express or implied contract between Mr. Glass and TRC, it follows that the Second Amended Complaint does not plausibly show that Integrity knew of any contract between Mr. Glass and TRC. At most, the Second Amended Complaint implies that Mr. Criddle knew that Mr. Glass worked for TRC. *See*

ECF No. 40, ¶¶ 9-16. But nothing imputes Mr. Criddle's knowledge to Integrity. *See supra* Section III.A. And nothing defeats the presumption that Mr. Glass's employment with TRC was at-will. *See supra* Section III.B.1.[4] In sum, the Second Amended Complaint fails to plausibly claim the first element of tortious interference with contract against Integrity.

      **C.**      **Active and Substantial Role**

The third element of tortious interference with contract requires a plaintiff to show that the defendant "played an active and substantial part in causing the plaintiff to lose the benefits of his contract." *See Wolf*, 1959-NMSC-044, ¶ 21. A plaintiff must allege "some voluntary conduct on the part of the defendant, some overt act which influence[d] the promisor to breach his contract." *Border Area Mental Health v. United Behav. Health, Inc.*, 331 F. Supp. 3d 1308, 1317 (D.N.M. 2018) (quoting *Wolf*, 1959-NMSC-044, ¶ 21); *see also Clary v. Total Facility Sols., Inc.*, No. 20-cv-00768, 2021 WL 1754196, at *4 (D.N.M. May 4, 2021) ("Plaintiff 'must allege (and prove) that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof.'" (quoting *Wolf*, 1959-NMSC-044, ¶ 22)).

One inference supports Mr. Criddle's influence on Mr. Glass's termination: Mr. Glass was fired the day after his interaction with Mr. Criddle. *See* ECF No. 40, ¶¶ 14-15. Mr. Glass also alleges that his TRC supervisor told him, "you're never going to believe this, but XTO is making us take you off the job." *Id.* ¶ 15. Finally, Mr. Glass alleges that the dropped-pipe incident was a pretext for his termination. *See id.* ¶¶ 17-18.

---

[4] Recall that Mr. Glass has not claimed tortious interference with prospective contractual relations. If he had, the Second Amended Complaint would still fall short by failing to impute Mr. Criddle's knowledge to Integrity.

13

But these facts and implications do not plausibly suggest that *Integrity* played an active and substantial role in Mr. Glass's termination. To repeat, the Second Amended Complaint has not plausibly imputed Mr. Criddle's actions to Integrity. *See supra* Section III.A. Simply put, no factual allegations in the Second Amended Complaint blame Integrity for the decision to terminate Mr. Glass. (To the contrary, the Second Amended Complaint alleges that the TRC supervisor blamed XTO. Mr. Glass has not explained or suggested that the supervisor's belief was a mistake. *See supra* note 3 and accompanying text.)

At bottom, Mr. Glass does not advance a factual allegation of any voluntary, overt act by Integrity that induced TRC to terminate Mr. Glass. *Cf. Border Area Mental Health, Inc.*, 331 F. Supp. 3d at 1317. Thus, the Second Amended Complaint fails to plausibly satisfy the third element of tortious interference with contract against Integrity.

Because the Second Amended Complaint fails to satisfy two elements of tortious interference with contract against Integrity, Mr. Glass has failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

### IV. CONCLUSION

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that *Defendant Integrity Inspection Services, LLC's Motion to Dismiss* (**ECF No. 60**) is **GRANTED**. Plaintiff Travis Glass's claims, and thus this case, are **DISMISSED WITH PREJUDICE**.

_____
SENIOR UNITED STATES DISTRICT JUDGE